# UNITED STATES DISTRICT COURT
for the District of Arizona

| United States Of America | Case No.: 25-3303 MJ |
|---|---|
| v. <br> Gong Tao | **CRIMINAL COMPLAINT** |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

## COUNT ONE

### (False Statement or Representation to a Federal Officer)

That on or about the 15th day of July, 2025, TAO GONG, did willfully and knowingly make a materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, by telling FBI Special Agents who were questioning him that he did not have access to a cellular telephone or other electronic communication device, other than the one taken from him by federal agents that day pursuant to a search warrant, when he did in fact have another cellular telephone, while at Zenith Semiconductor, 3133 W. Frye Road Suite 415, Chandler, Arizona 85226, in the District of Arizona. The statements and representations were false because, as TAO GONG then and there knew, he did have access to another cellular telephone, such cellular telephone having been seized from him after his false statements and representations.

In violation of Title 18, United States Code, Section 1001.

///
///
///

I further state that I am a Special Agent from the FBI, and that this complaint is based on the following facts:

### See attached Affidavit of Probable Cause

Continued on the attached sheet and made a part hereof:    ☒Yes    ☐ No

REVIEWED BY AUSA: Glenn B. Mccormick
*Digitally signed by GLENN MCCORMICK*
*Date: 2025.07.16 12:39:55 -07'00'*

Special Agent Gregory Ferrari, FBI
Name of Complainant

Signature of Complainant

Subscribed and sworn to me telephonically on:

July 16, 2025
Date

at    Phoenix, Arizona
       City and State

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT OF PROBABLE CAUSE

I, Special Agent Greg Ferrari, being first duly sworn, hereby state:

### INTRODUCTION

1. As described further below, this affidavit sets forth probable cause that on or about July 15, 2025, in the District of Arizona, the defendant, Tao Gong (hereinafter "GONG"), committed the crime of concealing material facts and making false statements to Federal Agents, a violation of Title 18 U.S.C. § 1001 by making false statements to FBI Special Agents in an interview after being advised that making false statements in the interview was a crime. GONG's Date of Birth is April 19, 1973, with a home address of 1543 S. Tamarisk Dr. or 1803 W. Kingbird Dr. Chander, Arizona 8, and is employed as the Chief Executive Officer (CEO) located for Zenith Semiconductor (hereinafter "Zenith") located at 3133 W. Frye Road Suite 415, Chandler, Arizona 85226.

### AGENT BACKGROUND

2. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately August 2020. Since January 2021, I have exclusively worked counterintelligence investigations at the FBI Phoenix Field Office. I spent approximately 21 weeks in Quantico, Virginia, at the New Agent Basic Field Training Course, where I received instruction on conducting federal investigations, legal statutes, probable cause, elements of crime and the Fourth Amendment. Prior to joining the FBI, I worked for approximately 14 years in corporate security, largely with a focus on protection of employer intellectual property (hereinafter "IP") and financial information.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, or witnesses. This affidavit is intended merely to show that there is sufficient probable cause for issuance of the complaint and does not set forth all of my knowledge about this matter. Statements recited are set forth in substance and in part unless otherwise indicated.

## PROBABLE CAUSE

*Former Employees Report Misappropriation of Company A and Company B Information*

4. Zenith Semiconductor is a small company in Chandler, Arizona, involved in the design of integrated circuits, including mixed digital/analog circuits used for power management applications in commercial markets. Zenith semiconductor has less than 15 employees. Company A is a large, publicly traded U.S. corporation that develops, and markets integrated circuits, including circuits used for power management applications. Company B is a large international integrated circuit foundry that manufactures integrated circuits designed by other companies, including Company A.

5. In February 2025, FBI Phoenix was contacted by a former employee of Zenith Semiconductor ("Employee-1"). Employee 1 is the former CEO of Zenith and was the CEO at the time of the interview. During an interview with FBI Phoenix Special Agents, Employee 1 advised he hired GONG and knew GONG from their previous employer, Company A. After Employee 1 hired GONG, GONG approached Employee 1 with what Employee 1 believed was stolen IP from Company A. GONG suggested to Employee 1 that Zenith use the information to get ahead of competition. Employee 1 contacted Zenith's co-owner, Shengwai Da (hereinafter "DA"), and advised him of GONG's possession of IP belonging to Company A. After that, Employee 1 fired GONG. In March 2025, shortly after speaking to Agents, Employee 1 was fired by DA. GONG was then hired back by DA as Zenith's current CEO.

2

6. In June 2025, FBI Phoenix Special Agents interviewed other current employees, hereinafter "Employee 2" and "Employee 3" of Zenith. Employee 2 and Employee 3 told Agents that Zenith has a sister company in Shanghai, China, called Senslab. Employees 2 and 3 understood Senslab to be the marketer of Zenith's designs and all design information was openly shared between the two companies. Senslab is owned by DA. Upon Employees 2 and 3 being hired by Zenith, they were provided stock options in Senslab Shanghai as part of their financial compensation. Based on my training and experience, I know that the design and manufacturing of integrated circuits is a priority technology area for the government of the People's Republic of China (hereinafter "PRC"). It is likely, therefore, that Senslab receives some amount of subsidy or sponsorship from the PRC government.

7. In early June 2025, Employee 3 was contacted by Company B regarding a current order Zenith had with Company B, to fabricate a microchip wafer Zenith designed. This microchip was designated ZA04. Company B asked Employee 3 what the status was on the order. Employee 3 researched the status in Zenith's internal system and discovered the design had been sent to another company in China for fabrication. Employee 3 understood the designs were created with protected technology from Company B. Employee 2 and Employee 3 explained the process from design to fabrication involves Zenith submitting their designs to a vendor, to "tape-out" the design. After the design is taped-out, the wafer is sent back to Zenith for testing and then sent out for manufacturing/production. Employee 2 and Employee 3 defined taped-out as an industry term that describes a step in the production process where a design is sent to a foundry for initial production to create a physical prototype that can be tested.

8. Employee 3 told Agents that Zenith's design, ZA04, was created using Company B's Process Design Kit (hereinafter "PDK"). The PDK is proprietary to Company B and can only be used by customers of Company B, as stated in contracts between the customer and Company B. It is a standalone program that could be forwarded

3

outside of Zenith, only as authorized by Company B. In addition, files created using the PDK are encrypted and cannot be read without having the expressed permission of Company B and access to Company B software. Employee 3 discovered on Zenith's internal system that the PDK for the ZA04 project had been transferred to a Chinese fabrication company. Employee 3 had recorded a conversation with other Zenith employees admitting to the Chinese company having the finalized Company B taped-out product. Employee 3 advised there was a non-disclosure agreement (hereinafter "NDA") with Company B and Zenith that explicitly states the finalized PDK cannot be shared except as permitted under the agreement between the two parties. Employee 3 believed that the NDA did not permit Zenith to share the PDK with the Chinese fabrication company without Company B's express permission.

9. Company B told Employees 2 and 3 that the only way an outside company would be able to read designs made on Company B's tools is if the outside company had stolen, or been sent, a copy of Company B's PDK, which would be a misappropriation of Company B's IP. Company B told Employees 2 and 3 that the incident would be investigated. On June 16, 2025, Employees 2 and 3 saw Zenith's account with Company B had been deleted/suspended.

10. Additionally, Employees 2 and 3 found that the ZA04 product, as well as other current Zenith projects, ZA05 and ZA07, contained IP that was marked in Zenith's systems and records as also belonging to Company A, as described below. ZA is the Zenith naming designation for differing power management integrated circuit designs. Employee 2 advised Agents that Company A and Zenith are direct competitors and that Company A would have strict NDAs with its employees and business partners prohibiting them from sharing this IP with anyone besides their own customers. Employee 2 knew this to be true because he was also a former employee of Company A and has been in the semiconductor industry for several years. Employee 2 provided a screenshot from Zenith's internal system showing an example of a file from the ZA05 product that listed the company owner as

4

Company A, with the author of the file having a Company A email address. Employee 2 confirmed the author employed by Company A has never worked for Zenith. In other examples Employee 2 and Employee 3 saw documents in Zenith's systems that were created by a person they knew to be an employee of Company A. The employees also saw markings on some documents listing Company A as the owner. Specifically, Employee 2 discovered microchip schematics belonging to Company A on the Zenith system and at least one "FMEDA" document. Employee 2 explained that a FMEDA document lists research and test data on a specific project. The FMEDA document properties clearly listed Company A as the creator and the document title stated it was for a product line belonging to Company A. In my experience I know that test and research data have value to a company as any competing company obtaining this information can move ahead with competing products much faster due to not having to go through a lengthy research and testing phase.

### *Gong Receives Cease-and-Desist from Company B*

11. According to Employee 2, in late June 2025, GONG received a cease-and-desist letter from Company B. Shortly after Employee 2 learned of the cease-and-desist letter, GONG ordered Zenith employees to begin deleting and shredding all records related to Company B. Employee 2 knew that Employee 3 had to bring his company laptop in to GONG so GONG could have records on the laptop deleted. Employee 2 knows Zenith's servers are located in Shangai in the PRC. Employee 2 also confirmed Zenith has local servers in their Chandler, Arizona office but believed Zenith intended the servers in Shanghai to become the primary servers for Zenith. Employee 2 knew that Zenith only employed one Information Technology (hereinafter "IT") worker, a newly graduated worker who had little experience and only worked two days a week. Because the IT worker was not usually in the office, Employee 2 believed any purging of records would likely be conducted by GONG. While on vacation, Employee 2 was informed by Employee 3 that GONG ordered workers to not come into the office the week of June 30, 2025, and

Employee 2 and Employee 3 believed this would give GONG time to purge records without oversight from other employees.

12. Company B informed FBI Phoenix on July 3, 2025, that Company B had finished their investigation of Zenith's reported misuse of Company B's IP and had made the decision to deactivate Zenith's customer profile with Company B. Company B did not plan further legal action but reserved their ability to do so in the future.

### *Statements Regarding the Capability of Zenith Engineers*

13. According to Employee 2 and Employee 3, engineers with years in the industry, Zenith engineers did not have the design capabilities to produce the type of technology found in Zenith's most advanced ZA designs, namely ZA05 and ZA07. According to Employee 4, a quality manager who was involved with Zenith quality controls, Zenith policy standards state the design to viability review timeline for a new ZA product is 18 months and this was industry standard. Employee 2 and Employee 3 knew that Zenith's most advanced ZA product was designed in 6 months or less and called the feat "impossible" without the use of another company's IP that could be used to copy their designs. A former Zenith General Manager, Employee 5 informed FBI Phoenix that after Employee 1 was fired from Zenith, and GONG was brought in as the new CEO, the products marketed by Zenith became more advanced and, in Employee 5's expertise, were not possible with the staff Zenith had unless Zenith was not designing the products from start to finish.

### *Evidence of DA and GONG's Mental State Regarding Stolen IP*

14. In addition to current evidence of theft of trade secrets, there is at least one active civil lawsuit alleging DA has committed copyright infringement in the past. According to United States District Court for the Northern District of California CASE NO. 5:24-CV-8427, plaintiff Suzhou Linkdome Technology Ltd., alleges that Defendants DA and Kami Vision, a company owned by DA, stole artificial intelligence technology (hereinafter "AI") software from the Plaintiff and began using the software in the

6

Defendant's products. This alleged willingness to use IP from another company is consistent with DA's willingness to rehire GONG after Employee 1 informed DA of GONG's attempt to use stolen IP at Zenith.

15. Employee 2, Employee 3, and Employee 4 explained that, after Employee 1 fired GONG, Employee 1 explained to the employees of Zenith that GONG had been fired for stealing IP. When GONG was rehired by DA and became the new CEO he addressed Zenith employees by confirming he had approached Employee 1 about using stolen IP but GONG explained he understood what he had attempted was wrong and it would not happen again. Employee 2 was informed by Employee 4 of a conversation with GONG after GONG received Company B's cease-and-desist letter. GONG explained to Employee 4 that the use of stolen IP was the same as speeding in a vehicle, admitting it is illegal, but you ultimately only pay a small fine.

16. Employee 2 and Employee 3 explained that, while they understand DA to be the owner of Zenith, they did not regularly interact with DA. Employees at Zenith received their work orders from GONG and believed GONG was the main source of any stolen IP and the driving factor in copying the stolen IP into Zenith products.

### *Gong's Time at Company A*

17. Employee 1 informed FBI PX that he worked with Gong at Company A and was responsible for hiring Gong. Per Law Enforcement checks, Gong was employed with Company A in 2020. As Employee 1 reported Gong's theft of IP, this information would have likely been taken some time during his employment in 2020.

### *Gong Interviews and False Statements*

18. At approximately 9:20 a.m. on July 15, 2025, GONG was interviewed at Zenith Semiconductor by FBI Agents, during the execution of a Federal search warrant at the business, 3133 W Frye Rd, Suite 415, Chandler, AZ. GONG was asked if he needed a linguist and was advised one was available via phone if needed. GONG said he did not need a linguist and said he would ask for clarification if he didn't understand. After Agents provided their identities and the

nature of the interview, GONG was advised by Agents that it is a crime to lie to Federal Agents. GONG acknowledged that he understood and wanted to speak with Agents freely. GONG admitted to Agents that the phone he had with him belonged to him and that he used it for work purposes as Zenith's CEO. GONG was not willing to give Agents the pin to access the phone. GONG also confirmed that he was the CEO of Zenith and that he made final decisions even though Zenith had two owners. During the close of the interview, GONG was asked for other contact information, if Agents needed to contact him later. GONG gave Agents his home address, 1803 W Kingbird Dr., Chandler, AZ but GONG advised that Agents had his phone and he did not have any additional methods of telephonic communication. Agents confirmed with GONG that he owned no other phones and asked if he had relatives that had a phone Agents could call to reach GONG. GONG advised that his family was traveling out of the country and Agents would not be able to call him. GONG voluntarily emptied his pockets and revealed no other electronic devices.

19. Immediately after GONG left the interview with Agents at Zenith, GONG was placed under surveillance. Surveillance teams maintained visual contact of GONG at all times, from the time he walked out of Zenith. GONG was observed leaving Zenith, returning to his home at 1543 S Tamarisk Drive, Chandler, Arizona 85286 and then returning to the office building that Zenith is located in. GONG was then observed sitting in his car, in the parking lot in front of Zenith, for approximately fifteen minutes. GONG then left and was followed to the Talking Stick Casino in Scottsdale, Arizona. GONG sat at a poker table in the casino and played poker for over an hour. While at the poker table, GONG was spotted with a phone that had been previously unidentified. Agents attempted to make contact with GONG at the Talking Stick Casino to discuss the possible new phone but GONG left the casino before Agents could find him.

20. GONG continued to be surveilled and was followed back to Zenith in Chandler, Arizona. Agents made contact with GONG outside the office building. Upon making contact with GONG, Agents observed a cellular phone sticking out of his front shirt pocket. The phone was detained off of GONG's person and Agents proceeded to interview GONG for a second time. GONG was told again by Agents that he was free to leave and if he spoke with Agents that it was

8

a crime to lie. GONG acknowledged Agents and continued to answer questions. He told Agents he did not have an additional phone because the new phone was "not a phone" but a "device". GONG explained that this device was different because it was not activated in the United States and that he did not use it to make phone calls. The phone was activated in China and was used for messaging. Agents asked if they could call the phone on a foreign number and GONG admitted they could. Agents asked if he would call it a "foreign phone" and GONG admitted that would make sense. GONG also said he could communicate with others outside of the U.S. on the phone, using applications like WeChat.

21. In the same interview, GONG made other statements known by Agents to be false. GONG discussed Zenith's relationship with Senslab in China. GONG explained the relationship was a partnership which saw Zenith design products and Senslab was in charge of marketing but their relationship was not contractual and Senslab had no connection to Zenith's designs. During earlier interviews with . GONG told Agents he did not know how Zenith would sell their products and that Zenith had $0 in revenues as they had not sold any chips. An earlier interviews with Employee 2, Employee 3, and Employee 4 confirmed that Senslab was responsible for the sale of Zenith products and they would be stamped as Senslab products. During the search of Zenith on 7/15/2025, Agents identified semiconductors that were stamped both Zentih and Senslab and the semiconductors appeared visually the same.

22. After the phone was seized and the interview was concluded, GONG was given a receipt for property and went back to his vehicle, a Volvo XC60 with Arizona license plate CHX4630, that was in the parking lot of 3133 W Frye Rd, Chandler, AZ. Surveillance spotted GONG open the rear of the SUV and open a liner on the inside of the vehicle. GONG reached into the liner and removed an object that appeared to be another cellular phone. GONG was observed looking down at the object and interacted with the object in the manner you would interact with a cellular phone. Surveillance then followed GONG to 1543 S Tamarisk Drive, Chandler, Arizona 85286. According to the Maricopa County Assessor website, GONG owns two properties in the Phoenix area, 1803 W Kingbird Dr and 1543 S Tamarisk Drive. GONG was observed on

07/15/2025 leaving the Tamarisk location before arriving to work at Zenith. GONG told Agents during the first interview that he resides at the Kingbird location. Based on observations and GONG's statements, GONG may have personal property at each location.

## CONCLUSION

1. Based on the foregoing, there is probable cause to conclude that on or about July 16, 2025, in the District of Arizona, the defendant, Tao Gong ("GONG"), committed the crime of concealing material facts and making false statements to Federal Agents, a violation of Title 18 USC, § 1001.

2. This affidavit is being sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose. I have thoroughly reviewed the affidavit and attest that there is sufficient evidence to establish probable cause that the defendant committed the crimes alleged.

Respectfully submitted,

*Greg Ferrari*
Greg Ferrari
Special Agent, FBI

Subscribed and sworn to me telephonically this 16 day of July, 2025.

*M Morrissey*
HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge

10